MICHAEL E. HEYGOOD,
PSC Member/MDL No. 2672-CRB
Texas Bar No. 00784267
CHARLES MILLER,
ESQ./SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice* to be Sought for:

ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| MELISSA NICOLAS and DENARD WHITE, et al. | ) ) ) | |
| Plaintiffs | ) ) | CASE NO. _____ |
| vs. | ) ) | **COMPLAINT AND JURY DEMAND** |
| AUDI AG and AUDI OF AMERICA, LLC, | ) ) | |
| Defendants. | ) | |

## PRELIMINARY STATEMENT

1.      The Plaintiffs (identified below in paragraphs 10-106 infra) bring this Complaint

(the "Complaint") against Defendants Audi AG and Audi of America, LLC ("Defendants" or

"Audi") seeking damages and other relief for Audi's installation of illegal defeat devices on their

vehicles.  Audi installed these "defeat devices" to skirt governmental emissions regulations by fooling the consumers and regulators into believing that the vehicles emitted far less carbon dioxide gas ("$CO_2$") than they emit in real-world driving conditions.

2.     When Plaintiffs purchased or leased their vehicles, they did not know that the vehicles had illegal defeat devices.  Audi designed these defeat devices to clandestinely reduce carbon dioxide emissions and to increase fuel efficiency when the vehicles are being tested for emissions and fuel efficiency.  But when the vehicles are being driven on the road, they emit significantly more $CO_2$ than Audi advertised and more than is allowed by law.

3.     The vehicles containing the illegal $CO_2$ defeat devices include at least those vehicles Audi equipped with (a) a ZF 8HP55 "AL 551" transmission, including, but not limited to, the A6, A7, A8, Q5, and Q7 models and (b) a DL 501-7Q "DL 501" transmission, including, but not limited to, the Audi S4, S5, S6, S7, and S8 models (collectively the "Fraudulent Vehicles").

4.     Audi sold or leased the Fraudulent Vehicles to Plaintiffs by falsely representing that they complied with relevant emissions standards when in normal use.  And Audi concealed—and failed to inform—Plaintiffs that Audi had installed illegal emissions defeat devices on their vehicles.  Audi also falsely represented the fuel efficiency of the Fraudulent Vehicles.

5.     Plaintiffs have sustained damages due to Audi's conduct in secretly installing defeat devices on their vehicles.  If Plaintiffs had known about the defeat devices, they would not have purchased or leased the Fraudulent Vehicles at all.  Or, if Audi had disclosed the existence of the defeat devices and taken the necessary mitigation efforts to make the Fraudulent Vehicles legal to sell, Plaintiffs would have paid significantly less for them.  Plaintiffs overpaid for their

vehicles (which do not provide the performance, fuel efficiency, and cleanliness that Audi advertised) and the value of their vehicles has diminished now that the existence of the defeat devices has been uncovered.

## JURISDICTION AND VENUE

6.     Pursuant to 28 U.S.C. § 1332(d)(11), this Court has jurisdiction over this case because it is a mass action under the Class Action Fairness Act ("CAFA").  This Court has subject matter jurisdiction over this case under CAFA because:  (1) this is a civil action in which the monetary claims of more than 100 plaintiffs are proposed to be tried jointly (2) the Plaintiffs' claims involve common questions of law or fact; (3) the total amount in controversy exceeds $5 million, exclusive of interest and costs; (4) each plaintiff in this lawsuit is seeking more than $75,000, exclusive of interest and costs; and (5) there is minimal diversity because at least one of the plaintiffs is a citizen of a different state than one of the defendants.

7.     Pursuant to 28 U.S.C. § 1331, this Court has also has jurisdiction over this case because each of the Plaintiffs has asserted a claim under the Magnuson - Moss Act seeking damages in excess of $50,000 exclusive of interest and costs (15 U.S.C. §§ 2301, et seq.). Therefore, Plaintiffs' claims arise under the laws of the United States.

8.     The Court has subject matter jurisdiction over this case for the reasons discussed above (*see* discussion *supra*).  This Court also has personal jurisdiction over the Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce in California numerous Audi automobiles, including the automobiles at issue in this case.  In addition, the fraudulent statements, breaches of contract, and breaches of warranty at issue in this case occurred, in part, in this District.  In addition, the claims at issue in this this case arise, in part, from Audi's contacts with California.  The

Defendants also conduct business in California and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in California. Audi's contacts with California were continuous and systematic.

9. Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Audi has conducted extensive business in this District, including, without limitation, marketing, advertising, selling, and leasing the Fraudulent Vehicles in this district. The Plaintiffs listed in paragraphs 10-18 below reside in this district and purchased their Fraudulent Vehicles in this District.

## PARTIES

### Plaintiffs

### California Plaintiffs
**Northern District of California Plaintiffs**

10. Plaintiff Melissa Nicolas is a citizen of California residing in San Mateo County, California. Ms. Nicolas purchased a used 2012 Audi Q5 3.0 gasoline vehicle in California. The vehicle is co-owned by Ms. Nicolas's spouse, Xuong Truong.

11. Denard White is a citizen of California residing in Solano County, California. Mr. White purchased a used 2012 Audi A6 3.0 gasoline vehicle at Audi of Oakland in Alameda County, California.

**Other California Plaintiffs**

12. Plaintiffs Jorge Gomez and Lorraine Gomez are citizens of California residing in Los Angeles County, California. Mr. and Ms. Gomez purchased a used 2013 Audi Q7 3.0 gasoline vehicle from Van Nuys Fiat Maserati in Van Nuys, Los Angeles County, California.

13.     Plaintiff Aaron Guilford is a citizen of California residing in Los Angeles County, California.  Mr. Guilford leased a new 2016 Audi S6 gasoline vehicle from Audi Valencia in Valencia, Los Angeles County, California.  The co-lessee of the S6 is Soung Oh.  Mr. Guilford also leased a new 2014 Audi A6 3.0 gasoline vehicle from Audi Beverly Hills in Beverly Hills, Los Angeles County, California.  The co-lessee of the A6 is Soung Oh.

14.     Marc Hobbs is a citizen of California residing in San Diego County, California. Mr. Hobbs purchased a used 2012 Audi A6 3.0 gasoline vehicle from Car Pros in Carson, Los Angeles County, California.

15.     Michael Landavazo is a citizen of California residing in San Bernardino County, California.  Mr. Landavazo purchased a new 2013 Audi Q7 3.0 gasoline vehicle from St. George Auto Group in Ontario, San Bernardino County, California.

16.     Yang Luo is a citizen of Arizona residing in Maricopa County, Arizona.  Mr. Luo purchased a used 2013 Audi S5 gasoline vehicle from Rusnak Westlake Audi in Thousand Oaks, Ventura County, California.

17.     Solomon Mansoor is a citizen of California residing in Los Angeles County, California. Mr. Mansoor leased a new 2014 Audi A8 3.0 gasoline vehicle in California.

18.     Nicholas Meter is a citizen of California residing in Los Angeles County, California.  Mr. Meter purchased a used 2013 Audi S4 3.0 gasoline vehicle from Audi Pacific in Torrance, Los Angeles County, California.

19.     Peter Patel is a citizen of California residing in San Bernardino County, California.  Mr. Patel purchased a new Audi A8 in California.  The vehicle is co-owned by Mr. Patel's spouse, Christine Patel.

20.     Tariq Rao is a citizen of California residing in Riverside County, California.  Mr. Rao leased a new 2016 Audi A8 3.0 gasoline vehicle from Walters Audi in Riverside, Riverside County, California.

## Georgia Plaintiffs

21.     David Crumpton and Linda Crumpton are citizens of Georgia residing in Cobb County, Georgia.  The Crumptons purchased a new 2016 Audi A6 3.0 from Rick Case Audi in Duluth, Gwinnett County, Georgia.

22.     Timothy Cunningham is a citizen of Alabama residing in Mobile County, Alabama.  Mr. Cunningham purchased a used 2013 Audi A8 3.0 gasoline vehicle from Atlanta Used Cars Center in Marietta, Cobb County, Georgia.

23.     DeAnn Ellis is a citizen of Georgia residing in Walton County, Georgia.  Ms. Ellis leased a new 2016 Audi A6 3.0 gasoline vehicle from Jim Ellis Audi in Marietta, Cobb County, Georgia.

24.     Stefan Freeman is a citizen of Georgia residing in Fulton County, Georgia.  Mr. Freeman purchased a new 2016 Audi S6 3.0 gasoline vehicle from Jim Ellis Audi in Marietta, Cobb County, Georgia.

25.     Brad Hise is a citizen of Georgia residing in Fulton County, Georgia.  Mr. Hise leased a new 2014 Audi Q7 3.0 gasoline vehicle from Jim Ellis Audi in Atlanta, Georgia.

26.     Robert Magee is a citizen of Mississippi residing in Scott County, Mississippi. Mr. Magee purchased a new 2014 Audi A6 3.0 gasoline vehicle from Jim Ellis Audi in Atlanta, Fulton County, Georgia.

27.     Rhonda Mitchell is a citizen of Georgia residing in Fulton County, Georgia.  Ms. Mitchell purchased a new 2012 Audi A6 3.0 gasoline vehicle from Jim Ellis Audi in Marietta, Cobb County, Georgia.

28.     Douglas Williamson is a citizen of Georgia residing in McDuffie County, Georgia.  Mr. Williamson purchased a used 2012 Audi Q7 3.0 gasoline vehicle from Gerald Jones VW Audi in Martinez, Columbia County, Georgia.

29.     Jeanne Wassem is a citizen of Georgia residing in Pickens County, Georgia.  Ms. Wassem purchased a new 2013 Audi Q7 3.0 gasoline vehicle from Audi North Atlanta in Atlanta, Fulton County, Georgia.

30.     Cliff Fretwell is a citizen of Georgia residing in Henry County, Georgia.  Mr. Fretwell purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Audi in Atlanta, DeKalb County, Georgia.

31.     David Colver is a citizen of Georgia residing in Fulton County, Georgia.  Mr. Colver purchased a used 2013 Audi S5 3.0 gasoline vehicle from Jim Ellis Audi in Marietta, Cobb County, Georgia.

32.     Edward Nail is a citizen of Georgia residing in Clayton County, Georgia.  Mr. Nail purchased a new 2016 Audi A6 3.0 gasoline vehicle from Rick Case Audi Gwinnett in Duluth, Gwinnett County, Georgia.

33.     George William Hardy is a citizen of Georgia residing in Fulton County, Georgia. Mr. Hardy purchased a used 2013 Audi Q7 3.0 gasoline vehicle from Jim Ellis Audi in Atlanta, DeKalb County, Georgia.

34.     Bryne and James George, IV are citizens of Georgia residing in Cobb County, Georgia.  Mr. and Mr. George, IV purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Jim Ellis Audi in Maretta, Cobb County, Georgia.

35.     Kletis Sloan is a citizen of Georgia residing in Cobb County, Georgia.  Mr. Sloan purchased a used 2012 Audi A7 3.0 gasoline vehicle from Gravity Auto in Atlanta, DeKalb County, Georgia.

36.     Victor and Molly Bateh are citizens of Georgia residing in Fulton County, Georgia.  Mr. and Mrs. Bateh purchased a new 2016 Audi A7 3.0 gasoline vehicle from Jim Ellis Audi in Atlanta, DeKalb County, Georgia.

37.     Constance Baldwin is a citizen of Alabama residing in Montgomery County, Alabama.  Ms. Baldwin purchased a new 2016 Audi A6 3.0 gasoline vehicle from Jim Ellis Audi in Marietta, Cobb County, Georgia.

38.      Jeff Marks is a citizen of Alabama residing in Jefferson County, Alabama.  Mr. Marks purchased a used 2012 Audi S4 3.0 gasoline vehicle from Audi Gwinnett in Deluth, Gwinnett County, Georgia.

39.     Jatin Patel is a citizen of Alabama residing in Elmore County, Alabama.  Mr. Patel purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Jim Ellis Audi in Atlanta, DeKalb County, Georgia.

40.     Clay Bresnan is a citizen of Florida residing in Lee County, Florida.  Mr. Bresnan purchased a used 2013 Audi Q7 3.0 gasoline vehicle from Mitchell Motor Company in Bowden, Carroll County, Georgia.

41.     Brandon Coleman is a citizen of Virginia residing in Halifax County, Virginia. Mr. Coleman purchased a used 2012 Audi A7 3.0 gasoline vehicle from Audi in Atlanta, DeKalb County, Georgia.

42.     Tony Clark is a citizen of Mississippi residing in Harrison County, Mississippi. Mr. Clark purchased a new 2013 Audi A8 3.0 gasoline vehicle from Jim Ellis in Atlanta, DeKalb County, Georgia.

43.     Avery Winder is a citizen of North Carolina residing in Mecklenburg County, North Carolina.  Mr. Winder purchased a used 2013 Audi A8 4.0 gasoline vehicle from Jim Ellis in Atlanta, DeKalb County, Georgia.

44.     Tjwana Dunbar is a citizen of South Carolina residing in Aiken County, South Carolina.  Ms. Dunbar purchased a new 2015 Audi Q5 3.0 gasoline vehicle from Gerald Jones Audi in Augusta, Columbia County, Georgia.

### Illinois Plaintiffs

45.     Jae and Hyunah Ahn are citizens of Illinois residing in DuPage County, Illinois. The Ahns purchased a new 2012 Audi Q5 vehicle.  The Ahns also purchased a used 2014 S4 gasoline vehicle from Mancuso Motorports in Chicago, Cook County, Illinois.

46.     Kathleen Bernicky and Christopher Bernicky are citizens of Indiana residing in Lake County, Indiana.  The Bernickys leased a 2013 Audi A6 3.0 gasoline vehicle from Fetcher Jones Audi in Chicago, Cook County, Illinois and purchased the vehicle at the end of the lease.

47.     Paul Cantz is a citizen of Illinois residing in Cook County, Illinois.  Mr. Cantz purchased a used 2013 Audi S4 from The Exchange in Highland Park, Lake County, Illinois.

48.     Terrah Cherry is a citizen of Illinois residing in Cook County, Illinois.  Mr. Cantz purchased a used 2015 Audi Q7 3.0 gasoline vehicle from Fetcher Jones Audi in Chicago, Cook County, Illinois.

49.     Denise Falcone is a citizen of Illinois residing in DuPage County, Illinois.  Ms. Falcone purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Continental Audi in Naperville, DuPage County, Illinois.

50.     Galina Garnys is a citizen of Illinois residing in Lake County, Illinois.  Ms. Garnys purchased a new 2015 Audi Q7 3.0 gasoline vehicle from Audi Exchange in Highland Park, Lake County, Illinois.

51.     Diann Gragg and Joe Gragg are citizens of Illinois residing in Sangamon County, Illinois.  The Graggs purchased a used 2012 Audi A6 3.0 gasoline vehicle from Green Toyota in Springfield, Sangamon County, Illinois.

52.     Richard Hossfeld and Brooke Bailey are citizens of Illinois residing in Cook County, Illinois.  Mr. Hossfeld and Ms. Bailey purchased a used 2014 Audi RS7 from the Audi Exchange in Highland Park, Lake County, Illinois.

53.     Todd Klopfenstien is a citizen of Illinois residing in DuPage County, Illinois.  Mr. Klopfenstien i leased or purchased a used 2014 Audi Q7 3.0 gasoline vehicle from Continental Audi in Naperville, DuPage County, Illinois.

54.     Heidi Ognibene and Michael Ognibene are citizens of Illinois residing in Boone County, Illinois.  The Ognibenes purchased a used 2013 Audi S8 from Napleton Audi in Loves Park, Winnebago County, Illinois.

55.     Raymond Quintana is a citizen of Illinois residing in DuPage County, Illinois. Mr. Quintana purchased a used 2015 Audi A8 3.0 gasoline vehicle from Continental Audi in Naperville, DuPage County, Illinois.

56.     Amar Shah is a citizen of Illinois residing in Cook County, Illinois.  Mr. Shah purchased a new 2017 Audi Q7 3.0 gasoline vehicle from Fetcher Jones Audi in Chicago, Cook County, Illinois.

57.     Waiel Sukkari is a citizen of Illinois residing in Will County, Illinois.  Mr. Sukkari purchased a new 2014 Audi Q7 3.0 gasoline vehicle from International Imports – Audi in Orland Park, Cook County, Illinois.

58.     Latasha Pittman is a citizen of Illinois residing in Cook County, Illinois.  Ms. Pittman purchased a new 2012 Audi S4 3.0 gasoline vehicle from Audi Exchange in Highland Park, Lake County, Illinois.

59.     Dan Caulfield is a citizen of Illinois residing in Cook County, Illinois.  Mr. Caulfield purchased a new 2015 Audi Q5 3.0 gasoline vehicle from Fletcher Jones Audi in Chicago, Cook County, Illinois.

60.     Michael Fox is a citizen of Illinois residing in Cook County, Illinois.  Mr. Fox purchased a new 2017 Audi Q7 3.0 gasoline vehicle from McGrath Audi in Morton Grove, Cook County, Illinois.

61.     Salena Whitfield is a citizen of Illinois residing in Cook County, Illinois.  Ms. Whitfield purchased a new 2013 Audi A6 3.0 gasoline vehicle from Fletcher Jones Audi in Chicago, Cook County, Illinois.

62.     Garrod Moltz is a citizen of Colorado residing in Denver County, Colorado.  Mr. Moltz purchased a used 2013 Audi S5 3.0 gasoline vehicle from Audi in Westmont, DuPage County, Illinois.

63.     Marie Bush is a citizen of Virginia residing in Norfolk County, Virginia.  Ms. Bush purchased a new 2012 Audi Q5 3.0 gasoline vehicle from International Imports in Tinsley Park, Cook County, Illinois.

### Kansas Plaintiffs

64.     Vincent Farha is a citizen of Kansas residing in Wichita County, Kansas.  Mr. Farha leased a new 2015 Audi A6 3.0 gasoline vehicle from Audi Wichita in Wichita, Sedgwick County, Kansas.

65.     Keith Vickers is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Vickers purchased a new 2013 Audi A6 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Kansas.

66.     Jonathan Farney is a citizen of Kansas residing in Butler County, Kansas.  Mr. Farney purchase a new 2015 Audi S4 3.0 gasoline vehicle from Audi in Wichita, Sedgwick County, Kansas.

67.     Chris Hill is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Hill purchased a new 2013 Audi S4 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Kansas.

68.     Adam Emo is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Emo purchased a new 2016 Audi A7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Kansas.

69.     Greg Burton is a citizen of Kansas residing in Johnson County, Kansas.  Mr. Burton purchased a used 2012 Audi Q5 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Kansas.

70.     Scott Ravis is a citizen of Kansas residing in Cherokee County, Kansas.  Mr. Ravis purchased a new 2013 Audi A7 3.0 gasoline vehicle from Molle Audi in Kansas City, Jackson County, Kansas.

### Kentucky Plaintiffs

71.     Neil Taylor is a citizen of Kentucky residing in Fayette County, Kentucky.  Mr. Taylor purchase a new 2013 Audi S4 3.0 gasoline vehicle from Audi in Lexington, Fayette County, Kentucky.

72.     Christopher Smith is a citizen of Kentucky residing in Jefferson County, Kentucky.  Mr. Smith purchased a used 2012 Audi A6 3.0 gasoline vehicle from Bluegrass Motors in Louisville, Jefferson County, Kentucky.

73.     Donald Wolf is a citizen of California residing in San Diego County, California.  Mr. Wolf purchased a used 2015 Audi Q7 3.0 gasoline vehicle from Jeff Wyler Alexandria in Florence, Boone County, Kentucky.

74.     Robertson Stokes is a citizen of Tennessee residing in Williamson County, Tennessee.  Mr. Stokes purchased a new 2014 Audi S4 3.0 gasoline vehicle from Bluegrass Motors in Louisville, Jefferson County, Kentucky.

**Louisiana Plaintiffs**

75.     Kyle Wild is a citizen of Louisiana residing in Saint Tammany Parish, Louisiana. Mr. Wild purchased a used 2013 Audi A8 4.0 gasoline vehicle from Audi of New Orleans, Orleans Parish County, Louisiana.

76.     Karl Wulf and Maritza Wulf are citizens of Louisiana residing in Jefferson Parish, Louisiana.  Mr. and Mrs. Wulf purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi of New Orleans in New Orleans, Orleans Parish County, Louisiana.

77.     Martha Ford is a citizen of Mississippi residing in Pearl River County, Mississippi.  Ms. Ford purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi of New Orleans, Jefferson Parish County, Louisiana

78.     Kyle Adams is a citizen of Mississippi residing in Lauderdale County, Mississippi.  Mr. Adams purchased a used 2014 Audi A6 3.0 gasoline vehicle from Brian Harris Autoplex in Slidell, Saint Tammany County, Louisiana.

**Maine Plaintiffs**

79.     Casey Pearson is a citizen of Massachusetts residing in Barnstable County, Massachusetts.  Ms. Pearson purchased a new 2017 Audi Q7 3.0 gasoline vehicle from Morong Audi in Falmouth, Cumberland County, Maine.

**Maryland Plaintiffs**

80.     Spencer Peace is a citizen of Maryland residing in Prince George's County, Maryland.  Mr. Peace purchased a used 2013 Audi A8 3.0 gasoline vehicle from Easterns Motor Center in Laurel, Prince George's County, Maryland.

81.     Schingtia Robertson is a citizen of Maryland residing in Charles County, Maryland. Mr. Robertson purchased a used 2012 Audi A6 3.0 gasoline vehicle from CarMax in Brandywine, Prince George's County, Maryland.

82.     Ginger Williams is a citizen of Maryland residing in Wicomico County, Maryland.   Ms. Williams purchased a new 2016 Audi S5 3.0 gasoline vehicle from Criswell Audi in Annapolis, Anne Arundel County, Maryland.

83.     Tony Mosley is a citizen of Maryland residing in Prince George's County, Maryland.  Mr. Mosley purchased a used 2012 Audi A8 4.0 gasoline vehicle from Jim Coleman in Clarksville, Howard County, Maryland.

**Massachusetts Plaintiffs**

84.     Damaris Berner is a citizen of Massachusetts residing in Essex County, Massachusetts.  Ms. Berner purchased a new 2015 Audi Q5 3.0 gasoline vehicle from Audi Brookline in Brookline, Norfolk County, Massachusetts.

85.     Peter Clark is a citizen of New Hampshire residing in Rockingham County, New Hampshire.  Mr. Clark purchased a new 2013 Audi Q5 3.0 gasoline vehicle from Herb Chambers Audi in Burlington, Middlesex County, Massachusetts.

86.     Timothy Davis is a citizen of Massachusetts residing in Norfolk, Massachusetts. Mr. Davis purchased a used 2013 Audi Q7 3.0 gasoline vehicle from Prime Acura in Walpole, Norfolk County, Massachusetts.

87.     Michael Devereaux is a citizen of Massachusetts residing in Middlesex County, Massachusetts.  Mr. Devereaux purchased a new 2013 Audi Q5 3.0 gasoline vehicle from Audi Burlington in Burlington, Middlesex County, Massachusetts.

88.     Peter Greaves is a citizen of Massachusetts residing in Bristol County, Massachusetts.  Mr. Greaves purchased a 2013 used Audi A6 3.0 gasoline vehicle from Audi Cape Cod in Hyannis, Barnstable County, Massachusetts.

89.     Amel Kovacevic is a citizen of New York residing in Oneida County, New York.  Mr. Kovacevic purchased a used 2012 Audi S4 from Dedham Auto Mall in Dedham, Norfolk County, Massachusetts.

90.     Dorene Lewey is a citizen of Massachusetts residing in Essex County, Massachusetts.  Ms. Lewey purchased a used 2013 Audi Q5 3.0 gasoline vehicle from IRA Lexus in Danvers, Essex County, Massachusetts.

91.     Joseph and Amy Moceri are citizens of New Hampshire residing in Belknap County, New Hampshire.  Mr. Morin purchased a used 2014 Audi Q7 3.0 gasoline vehicle from Herb Chambers BMW in Boston, Suffolk County, Massachusetts.

92.     David Morin is a citizen of New Hampshire residing in Hillsborough County, New Hampshire.  Mr. Morin purchased a used 2013 Audi A6 3.0 gasoline vehicle from Audi Burlington, Middlesex County, Massachusetts.

93.     Calvin McFadden is a citizen of Massachusetts residing in Hampden County, Massachusetts.  Mr. McFadden purchased a used 2013 Audi A8 4.0 gasoline vehicle from Audi Norwell in Boston, Suffolk County, Massachusetts.

94.     Tavish Wardell is a citizen of Vermont residing in Lamoille County, Vermont.  Mr. Wardell purchased a used 2014 Audi A6 3.0 gasoline vehicle from Audi Burlington in Burlington, Middlesex County, Massachusetts.

95.     Donald Accetta is a citizen of Massachusetts residing in Norfolk County, Massachusetts.  Mr. Accetta purchased a new 2012 Audi A6 3.0 gasoline vehicle from Audi in Westwood, Norfolk County, Massachusetts.

96.     Cris Ingemi is a citizen of Massachusetts residing in Essex County, Massachusetts.  Mr. Ingemi purchased a new 2012 Audi A7 3.0 gasoline vehicle from Ira Audi in Peabody, Essex County, Massachusetts.

97.     Linhu Phu is a citizen of Connecticut residing in Fairfield County, Connecticut.  Mr. Phu purchased a new 2013 Audi S5 3.0 gasoline vehicle from Noyes in New Hampshire, Cheshire County, Massachusetts.

98.     Aundra Budhram is a citizen of New York residing in Schenectady County, New York.  Ms. Budhram purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi of Burlington, Middlesex County, Massachusetts.

99.     Joseph Moceri is a citizen of New Hampshire residing in Belknap County, New Hampshire.  Mr. Moceri purchased a used 2014 Audi Q7 3.0 gasoline vehicle from BMW in Sudbury, Middlesex County, Massachusetts.

**Michigan Plaintiffs**

100.    Plaintiff Matthew Creech is a citizen of Michigan residing in Oakland County, Michigan.  Mr. Creech purchased a used 2014 Audi Q7 3.0 gasoline vehicle from Audi of Rochester Hills, in Rochester Hills, Oakland County, Michigan.

101.    Mark Kuriata is a citizen of Michigan residing in Berrien County, Michigan.  Mr. Kuriata purchased a used 2013 Audi A8 3.0 gasoline vehicle.

102.     Galyna Shubelyak is a citizen of Michigan residing in Oakland County, Michigan. Ms. Shubelyak purchased a used 2014 Audi Q7 3.0 gasoline vehicle from Belmont Motor Sales in Detroit, Wayne County, Michigan.

103.     David Majewski is a citizen of Michigan residing in Macomb County, Michigan. Mr. Majewski purchased a used 2012 Audi Q5 3.0 gasoline vehicle from Autohaus in Royal Oak, Oakland County, Michigan

**Minnesota Plaintiffs**

104.     Khosrow Kaywan Samadani is a citizen of Minnesota residing in Hennepin County, Minnesota.  Mr. Samadani leased a new 2015 Audi Q5 3.0 gasoline vehicle from Audi of Minneapolis, Hennepin County, Minnesota.

105.     Lucy Quinlivan is a citizen of Minnesota residing in Ramsey County, Minnesota. Ms. Quinlivan purchased a used 2014 Audi S4 3.0 gasoline vehicle from Luther VW in St. Louis Park, Hennepin County, Minnesota.

106.     Sergie Gontcharenko is a citizen of Michigan residing in Barry County, Michigan. Mr. Gontcharenko purchased a new 2014 Audi Q7 3.0 gasoline vehicle from Audi of St. Paul in Maplewood, Ramsey County, Minnesota.

**Defendants**

107.     Defendant Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Audi America is a citizen of Delaware and Virginia. See 28 U.S.C. § 1332(d)(10).  Audi America is a wholly owned United States subsidiary of Audi AG, and it engages in business, including the advertising, marketing, and sale of Audi automobiles, in all 50 states.

108.     Defendant Audi AG ("Audi AG") is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen AG. Audi AG directly controls and directs the actions of Audi of America, LLC. Audi AG designs, develops, manufactures, and sells luxury automobiles.  According to Audi AG, the Audi Group sold more than 200,000 vehicles in the United States in 2015.

## FACTUAL BACKGROUND

109.     Audi and its parent company, Volkswagen AG, have a long and sordid history of using defeat devices to falsify emissions test results.  In September 2015,the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") issued notices of violation accusing Volkswagen and Audi of equipping their diesel vehicles with illegal defeat devices to fake passing emissions results on their "Clean Diesel" vehicles. Those defeat devices allowed Volkswagen and Audi's diesel vehicles to detect government testing conditions and limit nitrous oxide ("NOx") while being tested.  But, during normal driving conditions, the diesel engines emitted NOx well above the legal limits.  Volkswagen and Audi were forced to admit the existence of these defeat devices.  This led to litigation and a multi-billion dollar settlement—one of the largest in U.S. history.  Volkswagen and Audi's conduct also led to criminal prosecutions.  Volkswagen AG pled guild to three criminal felonies and paid a $2.8 billion criminal penalty (on top of substantial civil penalties).

110.     Unfortunately, Audi's use of illegal defeat devices was not limited to diesel vehicles.  In July 2016, CARB discovered that Audi had also secretly installed defeat devices on some of its gasoline vehicles to limit $CO_2$ during emissions testing.   Just like the defeat devices

used to falsify NOx emissions on its diesel vehicles, Audi used defeat devices in the Fraudulent

Vehicles' to evade U.S. emissions standards.

111.    Audi installed defeat devices in vehicles equipped with one of two automatic

transmissions with the internal designations AL 551 and DL 501 through May 2016.  The AL

551 transmission is an eight-speed transmission that Audi sourced from transmission supplier ZF

Friedrichshafen (a/k/a ZF).  Audi obtained The DL 501 transmission from Volkswagen. Audi

A6, A7, A8, Q5, Q7, S4, S5, S6, S7, and S8 gasoline models are equipped with the AL 551 and

DL 501 transmissions that contain the defeat devices at issue in this lawsuit.

112.    Volkswagen and Audi knew that emissions and fuel consumption are critical

factors that consumers use to decide what cars to purchase.  Audi told consumers that its vehicles

used less fuel and emitted less $CO_2$ than the cars actually do in normal driving conditions.

113.    Audi hid its deception by programming its engines with different modes.  One of

these modes—which Audi deceptively called the "warm-up" mode—used significantly less fuel

and emitted much less $CO_2$, but also delivered significantly less power.  The "warm up" mode

activates when the Fraudulent Vehicles are started.  While the "warm-up" function is on, the

automatic transmission remains in a "switching program" that reduces the engine speed,

consumes less fuel, and produces less $CO_2$.

114.    Audi's use of the "warm up" mode was not limited to start up.  Audi also used

this mode to falsify emissions test results. Audi engineers determined that the only time the

Fraudulent Vehicles would run continuously with no steering wheel input was during

examination in a lab, on a test bed. The vehicles' transmission control modules ("TCM")

therefore set "shift points" that allow the vehicles to detect those lab conditions and to produce

compliant emission results under those conditions (known by Volkswagen as the "dyno

calibration" mode).[1]   Under these static dynamometer lab conditions (a vehicle treadmill), the defeat devices enable the Fraudulent Vehicles to operate in this low power mode.  This low power mode is also known as the "low $CO_2$" program.  It works by causing the Fraudulent Vehicles to shift gears early to artificially lower engine revs and emissions.

115.    During normal driving conditions, the transmission computer switches to "road calibration" mode.  In contrast to "low $CO_2$" mode, the "road calibration" mode  gives full power to the driver, resulting in increased fuel consumption and greater $CO_2$ emissions.  The road calibration mode switches on when the driver turns the steering wheel 15 degrees.  That usually happens seconds after a car is started in normal driving conditions.

116.    Audi used the defeat devices to deceive governmental authorities and consumers about the Fraudulent Vehicles' true fuel consumption and $CO_2$ emissions.  A vehicle's advertised fuel economy (listed on its "Monroney Sticker") is determined by driving a vehicle over five standardized driving patterns (or drive cycles).  These driving patterns are tested in a laboratory on a dynamometer where the conditions for all tests can be controlled.  These driving cycles include cold starts, hot starts, highway driving, aggressive high-speed driving, and driving with the air conditioner in use.  The defeat device software is located in the TCM.  The engineers imbedded the cheat software in the TCM unit, to make it difficult to detect.

117.    The TCM is designed to establish shift logic by responding to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit

---

[1] The defeat device software is part of the TCM.  The TCM is designed to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust  temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit ("ECU") work together to implement the cheating function. Audi engineers intentionally put the cheat software in the TCM unit to make the defeat device more difficult to detect.

("ECU") work together to cheat on emissions tests. Data from the five drive cycles are combined and adjusted for "real world" conditions in a way to represent "City" driving and "Highway" driving.  The "combined" fuel economy is the average of the City and Highway values with weights of 55% and 45% respectively. These adjusted and combined values appear on the vehicle's Monroney sticker.

118.    The drive cycles are performed on a dynamometer in a lab while the Fraudulent Vehicles' "low $CO_2$" mode is activated.  During each cycle, pollutants are measured.  This includes un-combusted or partially combusted gasoline (hydrocarbons or HC), carbon monoxide (CO) and carbon dioxide ($CO_2$).  The amount of carbon produced is then converted to the amount of gasoline that was required to produce the carbon in the exhaust.  The amount of gasoline produced during the tests is divided into the distance driven on the test to produce the fuel economy.

119.    Mathematically, as the amount of $CO_2$ produced increases, a vehicle gasoline uses more gasoline and the fuel economy decreases. Therefore, if a Defective Vehicle produces less $CO_2$ during laboratory testing (while in "low $CO_2$" mode) but higher $CO_2$ when driven on the road, then the vehicle would have a higher estimated fuel economy rating on the Monroney sticker than the vehicle would actually have while being driven.

120.    This is how Audi's defeat devices worked in the Fraudulent Vehicles.  The defeat device program gives the Fraudulent Vehicles two modes. The "dyno calibration" mode lowers fuel supply and limits revolutions per minute ("rpms") per gear, which curtails fuel burn and lowers emissions.  The "low $CO_2$" or "dyno calibration" mode is activated during all of the laboratory testing used to calculate the Fraudulent Vehicles' supposed fuel economy.  On the other hand, the "road calibration" mode allows the engine to turn maximum rpms in each gear

and furnishes the necessary—greatly increased—fuel supply required to deliver advertised torque and performance. The "road calibration" mode is active during all normal driving.

121.    Audi knew what it was doing.  In fact, it commissioned its own study, which found that a vehicles' fuel consumption on the road increased by 8.5 percent after the wheel was turned.  Audi executives knew how the defeat device worked, and instructed company employees to utilize it to deceive regulators and consumers.  Volkswagen and Audi management discussed the defeat device software in detail, for example, during a "Summer Drive" event in South Africa in the second half of February 2013. According to the event minutes, Axel Eiser, then the head of Audi's powertrain division (and currently the head of powertrain development of the entire Volkswagen group) asked: "When will we have the cycle optimized shift program?" He continued: "The shifting program shall be designed to be 100% active on the dyno, but only 0.01% in the hands of the customer."[2]  The meaning of Mr. Eiser's statement is crystal clear— Audi executives intentionally used the defeat device to deceive regulators and consumers by activating the "low $CO_2$" or "dyno calibration" mode in testing conditions.  This practice is highly deceptive and illegal.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

### **Discovery Rule Tolling**

122.    Plaintiffs could not have discovered through reasonable diligence that their Fraudulent Vehicles were defective within the time period of any applicable statutes of limitation.  Plaintiffs did not know and could not have known until November 7, 2016, the time when published reports first revealed that the Fraudulent Vehicles are equipped with defeat

---

[2] Kayhan Oezgenc and Jan C. Wehmeyer, *This is How the Manufacturer Cheated on $CO_2$*, Bild am Sonntag (November 5, 2016) http://www.bild.de/bild-plus/auto/auto-news/audi/so-schummelte-der-hersteller-bei-co-48621300.bild.html

1   devices.  Plaintiffs' claims did not accrue until they discovered that the defeat device caused the

2   Fraudulent Vehicles to fail required emissions standards.

3   **Fraudulent Concealment Tolling**

4   123.   At all relevant times, Audi concealed the existence of the defeat devices from

5   Plaintiffs and failed to disclose any information to Plaintiffs about the defeat devices on the

6   Fraudulent Vehicles.  Audi deliberately hid the information that Plaintiffs needed to discover the

7   existence of the defeat devices at an early time using reasonable diligence.  Despite knowing that

8   its vehicles contained illegal defeat devices, Audi continued to manufacture, market, distribute,

9   lease, and/or sell the Fraudulent Vehicles to Plaintiffs.  This conduct amounted to concealment

10  and failure to notify Plaintiffs about any facts that would have alerted Plaintiffs to the existence

11  of the defeat devices on the Fraudulent Vehicles.

12  124.   Plaintiffs justifiably relied on Audi to disclose these material defects in the Audi

13  vehicles they purchased or leased, as such defects were hidden and not discoverable through

14  reasonable efforts by Plaintiffs.  All applicable statutes of limitation have been tolled and

15  suspended with respect to Plaintiffs' claims arising from the existence of the defeat devices on

16  the Fraudulent Vehicles by virtue of the fraudulent concealment doctrine.

17  **Estoppel**

18  125.   Audi was under a continuous duty to disclose to Plaintiffs the existence of the

19  defeat devices.  The existence of the defeat devices has had a substantial, negative effect on the

20  character, quality, performance, and nature of the Fraudulent Vehicles. Audi actively hid the true

21  character, quality, performance, and nature of the defeat device in the Fraudulent Vehicles, and

22  Plaintiffs reasonably relied upon Audi's knowing and active concealment of these facts.  Audi is

23  accordingly estopped from relying on any statute of limitations in defense of this action.  For

-24-

these same reasons, Audi is estopped from relying upon any warranty mileage and age limitations in defense of this action.

## CLAIMS FOR RELIEF

## COUNTS COMMON TO ALL PLAINTIFFS

### COMMON COUNT 1
### VIOLATION OF MAGNUSON MOSS WARRANTY ACT,
### (15 U.S.C. §§ 2301, *et seq.*)
### (On Behalf of all Plaintiffs)

126.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

127.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

128.    Defendants are "supplier[s]" and "warrantor[s]" within the meaning of 15 U.S.C. § 2301(4) and (5) because they regularly sell Audi vehicles accompanied by the written Limited Warranties.

129.    Plaintiffs are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Fraudulent Vehicles for personal, family, or household purposes.

130.    The Fraudulent Vehicles are "consumer products" within the meaning of the Act. 15 U.S.C. § 2301(1).

131.    The Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.  15 U.S.C. § 2310(d)(1)

132.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds

$25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this suit.

133.    Under the Act, damaged "consumers" have a private cause of action against any warrantor that fails to comply with a written or implied warranty.

134.    Audi provided Plaintiffs with two express warranties:  (1) "bumper-to-bumper" limited express warranty coverage for a minimum of four years or 50,000 miles, whichever comes first, and which covers emission related repairs; and (2) a federal emissions warranty that covers the repair and replacement of all emission control and emission- related parts for two years or 24,000 miles (whichever comes first), and covers specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on-board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first). These express warranties constitute written warranties within the meaning of 15 U.S.C. § 2301(6).  The Fraudulent Vehicles' implied warranties are covered by 15 U.S.C. § 2301(7).

135.    The terms of the written warranties and implied warranties became part of the basis of the bargain between Plaintiffs when deciding to purchase a Defective Vehicle.

136.    Audi breached these written and implied warranties as described in detail above. Without limitation, the Fraudulent Vehicles share a common design defect in that they emit more carbon dioxide than: (a) is allowable under the applicable regulations, and (b) Audi represented were emitted to their customers, the public, and regulators.

137.    Plaintiffs have had sufficient direct dealings with either Audi or its agents (including Audi dealerships) to establish privity of contract between Audi, on the one hand, and Plaintiffs, on the other hand. Nonetheless, privity is not required here because Plaintiffs are

intended third-party beneficiaries of contracts between Audi and its dealers, and specifically, of Audi's implied warranties. The dealers were not intended to be the ultimate consumers of the Fraudulent Vehicles and have no rights under the warranty agreements provided with the Fraudulent Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

138. Affording Audi a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, Audi knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Fraudulent Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect.  Under the circumstances, the remedies available under any informal settlement procedures would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Audi a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

139. As a direct and proximate result of Audi's breach of the written warranties and the implied warranty of merchantability, Plaintiffs have suffered damages in an amount to be determined at trial.

140. Plaintiffs seek all damages permitted by law, including:  compensation for the monetary difference between the Fraudulent Vehicles as warranted and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or renting replacement vehicles; other incidental and consequential damages; statutory attorney fees; and all other relief allowed by law.

## COMMON COUNT 2
## FRAUD
### (On Behalf of all Plaintiffs)

141.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

142.    As alleged above, Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead both regulators and Plaintiffs about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted significantly larger quantities of carbon dioxide.  The result was precisely what Audi intended— the Fraudulent Vehicles were able to pass emission testing by way of deliberately induced false readings.  Defendants, thus, successfully imported, sold, and/or leased thousands of Fraudulent Vehicles to unwitting American consumers.

143.    Audi falsely represented that the Fraudulent Vehicles had functioning emissions systems that operated within legal limits during normal driving conditions.

144.    Audi's false representations and omissions were material to consumers, as they concerned the legality and marketing features of the Fraudulent Vehicles.

145.    Plaintiffs reasonably relied on Audi's deception, and Audi intended that they would so rely. Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the defeat devices were sophisticated technology that could not be discerned by regulators, much less consumers.

146.    Audi's scheme to design and install defeat device software in the Fraudulent Vehicles for the specific purpose of circumventing U.S. law, and then concealing their fraudulent scheme, reveals a corporate culture that emphasized sales and profits over integrity and public health.

147.    Audi had a duty to disclose the defeat devices to regulators and the public.

148.    Audi hatched the deceptive scheme and knew that its customers, including Plaintiffs, did not know about, and could not reasonably discover, its scheme.

149.    Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth.

150.    As a direct and proximate result of Audi's fraudulent scheme, Plaintiffs sustained damages.  They own or lease Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised or marketed. Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

151.    Audi is liable to Plaintiffs for damages in an amount to be proven at trial. Moreover, because Audi acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiffs for the purpose of enriching themselves to Plaintiffs' detriment; therefore, Audi's conduct warrants substantial punitive and exemplary damages in an amount to be determined at trial.

**COMMON COUNT 3**
**BREACH OF CONTRACT**
**(On Behalf of all Plaintiffs)**

152.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

153.    Every purchase or lease of a Defective Vehicle from an authorized dealer of Audi constitutes a contract between Audi and the purchaser or lessee. Audi materially breached these contracts by selling or leasing Plaintiffs defective, non-compliant Fraudulent Vehicles and by misrepresenting or failing to disclose the existence of the defeat device, rendering the Fraudulent Vehicles substantially less valuable than the vehicles that the Defendants advertised and promised to deliver to Plaintiffs.

154.    Audi's misrepresentations and omissions alleged herein caused Plaintiffs to enter into their agreements to purchase or lease their Fraudulent Vehicles. Absent those misrepresentations and omissions, Plaintiffs would not have purchased or leased their Fraudulent Vehicles and/or would not have purchased or leased their Fraudulent Vehicles at the prices they paid. Accordingly Plaintiffs overpaid for their Fraudulent Vehicles and did not receive the benefit of their bargain.

155.    Audi also breached their implied covenant of good faith and fair dealing under the laws of all 50 states and the District of Columbia.  By delivering a vehicle that contained defeat device software and thus exceeded, during normal use, federal and state emission limits, Audi violated Plaintiffs' fair and reasonable expectations under their respective contracts.  In addition, Audi's misrepresentations and omissions violated Audi's implied duty to deal honestly, and within reasonable commercial standards of fair dealing, with Plaintiffs.

156.    As a direct and proximate result of Audi's breach, Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COMMON COUNT 4**
**UNJUST ENRICHMENT**
**(On Behalf of all Plaintiffs)**

157.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

158.    Audi benefitted from selling and leasing, at an unjust profit, Fraudulent Vehicles that had artificially inflated values due to Audi's concealment of the defeat devices, and Plaintiffs have overpaid for these vehicles.

159.    Audi received and retained unjust benefits from the Plaintiffs and inequity has resulted.

160.    It is inequitable and unconscionable for Audi to retain these benefits.

161.    Because Audi concealed their fraud and deception, Plaintiffs were not aware of the true facts concerning the Fraudulent Vehicles and did not benefit from Audi's misconduct.

162.    Audi knowingly accepted the unjust benefits of their fraudulent conduct.

163.    As a result of Audi's misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs in an amount to be proven at trial.

**CALIFORNIA COUNT 1**
**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT**
**BREACH OF IMPLIED WARRANTY**
**(Cal Civ. Code §§ 1790, et seq.)**
**(On Behalf of the California Plaintiffs)**

164.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

165.     Plaintiffs who purchased Fraudulent Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791.

166.     The Fraudulent Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

167.     Audi is the "manufacturer" of the Fraudulent Vehicles within the meaning of Cal. Civ. Code § 1791(j).

168.     Audi impliedly warranted to Plaintiffs that the Fraudulent Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fraudulent Vehicles do not have the quality that a buyer would reasonably expect.

169.     Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)     Pass without objection in the trade under the contract description.

(2)     Are fit for the ordinary purposes for which such goods are used.

(3)     Are adequately contained, packaged, and labeled.

(4)     Conform to the promises or affirmations of fact made on the container or label.

170.     The Fraudulent Vehicles would not pass without objection in the automotive trade because they share a common design defect in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

171.    Fraudulent Vehicles are not adequately labeled because the labeling fails to disclose the fact that they are defective.

172.    In the various channels of information through which Audi sold Fraudulent Vehicles, Audi failed to disclose material information concerning the Fraudulent Vehicles, which it had a duty to disclose. Audi had a duty to disclose the defect because, as detailed above: (a) Audi knew about the defect; (b) Audi had exclusive knowledge of material facts not known to the general public, Plaintiffs, and (c) Audi actively concealed material facts concerning the fact that the Fraudulent Vehicles were equipped with defeat devices from the general public, Plaintiffs. As detailed above, Audi knew the information concerning the defect at the time of advertising and selling the Fraudulent Vehicles, all of which was intended to induce consumers to purchase the Fraudulent Vehicles.

173.    Audi breached the implied warranty of merchantability by manufacturing and selling Fraudulent Vehicles that are defective.  Furthermore, this defect has caused Plaintiffs to not receive the benefit of their bargain and have caused the Fraudulent Vehicles to depreciate in value.

174.    Plaintiffs have been damaged as a result of the diminished value of Audi's products.

175.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

176.    Under Cal. Civ. Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT 2**
**VIOLATION OF THE SONG-BEVERLY CONSUMER PROTECTION ACT,**
**BREACH OF EXPRESS WARRANTY**
**Cal Civ. Code §§ 1790, *et seq*.**
**(On Behalf of the California Plaintiffs)**

177.    Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

178.    Plaintiffs who purchased or leased the Fraudulent Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

179.    The Fraudulent Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

180.    Audi is a "manufacturer" of the Fraudulent Vehicles within the meaning of California Civil Code § 1791(j).

181.    Audi made express warranties to Plaintiffs within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

182.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

183.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

-34-

184.     Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiffs are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fraudulent Vehicles, or the overpayment or diminution in value of their Fraudulent Vehicles.

185.     Pursuant to California Civil Code § 1794, Plaintiffs are entitled to costs and attorneys' fees.

**CALIFORNIA COUNT 3**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal Bus. & Prof. Code §§ 1750,** *et seq.*
**(On Behalf of the California Plaintiffs)**

186.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

187.     Plaintiffs were deceived by Audi's failure to disclose that the Fraudulent Vehicles share a uniform defect in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

188.     Audi engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices, knowingly made materially incomplete representations as to the characteristics, uses and benefits of the Fraudulent Vehicles.

189.     In the various channels of information through which Audi sold Fraudulent Vehicles, Audi failed to disclose material information concerning the Fraudulent Vehicles, which it had a duty to disclose. Audi had a duty to disclose the defect because, as detailed above, (a) Audi knew about the defeat device equipped on the Fraudulent Vehicles; (b) Audi had exclusive

knowledge of material facts not known to the general public, Plaintiffs, and (c) Audi actively concealed material facts concerning the defeat device from the general public, Plaintiffs. As detailed above, Audi knew the information concerning the defect at the time of advertising and selling the Fraudulent Vehicles, all of which was intended to induce consumers to purchase the Fraudulent Vehicles.

190.    Audi intended for the Plaintiffs to rely on it to provide adequately designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

191.    Audi intentionally failed or refused to disclose the defect to consumers.

192.    Audi's conduct and deceptive omissions were intended to induce Plaintiffs to believe that the Fraudulent Vehicles were adequately designed and adequately manufactured automobiles.

193.    Audi's conduct constitutes unfair acts or practices as defined by the California Consumers Legal Remedies Act (the "CLRA").

194.    Plaintiffs have suffered injury in fact and actual damages resulting from Audi's material omissions because they paid inflated purchase prices for the Fraudulent Vehicles.

195.    Plaintiffs seek an order enjoining Audi's unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

196.    In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Audi with notice of their alleged violations of Cal. Civ. Code § 1770(a) relating to the Fraudulent Vehicles purchased by Plaintiffs, and demand that Audi corrects or agrees to correct the actions described therein within thirty (30) days of such notice.  If Audi fails

to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the

Complaint) to include compensatory and monetary damages to which Plaintiffs are entitled.

197.    Audi's conduct described herein is fraudulent, wanton, and malicious.

## **GEORGIA COUNTS**

### **GEORGIA COUNT 1**
### **VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
### **Ga. Code Ann. § 10-1-390, et seq.**
### **(On Behalf of the Georgia Plaintiffs)**

198.    Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

199.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or

deceptive acts or practices in the conduct of consumer transactions and consumer acts or

practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not

limited to "representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or

services are of a particular standard, quality, or grade … if they are of another," and

"[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-

1-393(b).

200.    In the course of their business, Audi concealed and suppressed material facts

concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat

device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission

test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles

would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi

intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false

readings. Plaintiffs had no way of discerning that Audi's representations were false and

misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

201.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

202.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles were material to Plaintiffs.

203.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs about the true nature of the Fraudulent Vehicles.

204.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Audi's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

205.    Audi had an ongoing duty to all Audi customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of Fraudulent Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Audi's deceptive and unfair acts and practices made in the course of Audi's business.

206.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

207.    As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

208.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann. § 10-1-399(a).

209.    Plaintiffs also seek an order enjoining Audi's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann. § 10-1-399.

210.    Audi failed to remedy its unlawful conduct within the requisite time period. Thefore, Plaintiffs will seek all damages and relief to which they are entitled under the Georgia FBPA.

## GEORGIA COUNT 2
### VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
Ga. Code Ann. § 10-1-370, et seq.
(On Behalf of the Georgia Plaintiffs)

211.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

212.    Plaintiffs and Audi are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1- 371(5).

213.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

214.     In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended- the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

215.     Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

216.     Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

217.     Audi knew or should have known that its conduct violated the Georgia UDTPA.

218.     Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.     intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

219.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

220.   Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

221.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

222.   As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

223.   Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

**GEORGIA COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)**
**(On Behalf of the Georgia Plaintiffs)**

224.   Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

225.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

226.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

227.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

228.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

229.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

230.    As a direct and proximate result of the Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**GEORGIA COUNT 4**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)**
**(On Behalf of the Georgia Plaintiffs)**

231.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

232.     Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

233.     With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

234.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

235.     A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

236.     The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

237.     As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**ILLINOIS COUNTS**

**ILLINOIS COUNT 1**
**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, et seq. and 720 ILCS 295/1a)**
**(On Behalf of the Illinois Plaintiffs)**

238.　Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

239.　Defendants are "person[s]" as that term is defined in 815 ILCS 505/1(c).

240.　Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

241.　The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

242.　In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and

misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

243.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

244.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

245.    Audi knew or should have known that its conduct violated the Illinois CFA.

246.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

    b.    intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

    c.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

247.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

248.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

249.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Audi's misrepresentations and its concealment of and failure to disclose material

information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

250.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

251.    As a direct and proximate result of Audi's violations of the Illinois CFA, Plaintiffs have suffered injury-in-fact and/or actual damage.

252.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Audi in the amount of actual damages, as well as punitive damages because Audi acted with fraud and/or malice and/or was grossly negligent.

253.    Plaintiffs also seek an order enjoining Audi's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 et seq.

**ILLINOIS COUNT 2**
**BREACH OF EXPRESS WARRANTY**
**(810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)**
**(On Behalf of the Illinois Plaintiffs)**

254.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

255.    Audis is and was at all relevant times a "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

256.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

-46-

257.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

258.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

259.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

260.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## ILLINOIS COUNT 3
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)
### (On Behalf of the Illinois Plaintiffs)

261.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

262.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

263.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

264.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

265.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

266.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

267.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### KANSAS COUNTS

### KANSAS COUNT 1
### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
**(Kan. Stat. Ann. § 50-623, et seq.)**
**(On Behalf of the Kansas Plaintiffs)**

268.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

269.    Audi is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

270.    Plaintiffs are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more of the Fraudulent Vehicles.

271.   The sale of the Fraudulent Vehicles to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

272.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

273.   In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

274.   Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

275.   Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

276.   Audi knew or should have known that its conduct violated the Kansas CPA.

277.   Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.   intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

278.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

279.   Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

280.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and

mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

281. Audi's violations present a continuing risk to Plaintiffs as well as to the general public. Audi's unlawful acts and practices complained of herein affect the public interest. 1560. As a direct and proximate result of Defendants' violations of the Kansas CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

282. Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against Audi measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

283. Plaintiff also seeks an order enjoining Audi's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

**KANSAS COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Kan. Stat. §§ 84-2-314 and 84-2A-212)**
**(On Behalf of the Kansas Plaintiffs)**

284. Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

285. Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

286. With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

287. The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

288.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

289.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

290.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**KANSAS COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. §§ 84-2-314 and 84-2A-210)**
**(On Behalf of the Kansas Plaintiffs)**

291.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

292.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

293.    With respect to leases, Audi is and was at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

294.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

295.     As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

296.     As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

297.     As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## KENTUCKY COUNTS

### KENTUCKY COUNT 1
### VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT
### (Ky. Rev. Stat. § 367.110, et seq.)
### (On Behalf of the Kentucky Plaintiffs)

298.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

299.     Defendants and Plaintiffs are "persons" within the meaning of the Ky. Rev. Stat. § 367.110(1).

300.     Audi engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

301.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." Ky. Rev. Stat. § 367.170(1).

302.    In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

303.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles

304.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

305.    Audi knew or should have known that its conduct violated the Kentucky CPA.

306.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.   intentionally concealed the foregoing from regulators and Plaintiffs; and/or

c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

307.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

308.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

309.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

310.   As a direct and proximate result of Defendants' violations of the Kentucky CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

311.   Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

312.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining Audi's unfair,  unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

**KENTUCKY COUNT 2**
**BREACH OF EXPRESS WARRANTY**
**(Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210)**
**(On Behalf of the Kentucky Plaintiffs)**

313.     Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

314.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-03(3), and "sellers" of motor vehicles under § 355.2-103(1)(d)

315.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

316.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

317.     As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

318.     As a result of Defendants' breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

319.     As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**KENTUCKY COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212)**
**(On Behalf of the Kentucky Plaintiffs)**

320.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein

321.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

322.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

323.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

324.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

325.    The Fraudulent Vehicles were not in merchantable condition and were not fit for the purpose for which ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

326.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## LOUISIANA COUNTS

**LOUISIANA COUNT 1**
**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(La. Rev. Stat. § 51:1401, et seq.)**
**(On Behalf of the Louisiana Plaintiffs)**

327.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

328.    Audi and Plaintiffs are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

329.    Plaintiffs are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

330.    Audi engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

331.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Audi participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

332.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and

misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

333.     Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

334.     Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

335.     Audi knew or should have known that its conduct violated the Louisiana CPL.

336.     Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.     intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.      made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

337.     Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

338.      Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

339.     Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material

information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have

purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and

mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

340.    Audi's violations present a continuing risk to Plaintiffs as well as to the general

public. Defendants' unlawful acts and practices complained of herein affect the public interest.

341.    As a direct and proximate result of Audi's violations of the Louisiana CPL,

Plaintiffs have suffered injury-in-fact and/or actual damage.

342.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs seek to recover actual damages in

an amount to be determined at trial; treble damages for Audi's knowing violations of the

Louisiana CPL; an order enjoining Audi's unfair, unlawful, and/or deceptive practices;

declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev.

Stat. § 51:1409.

**LOUISIANA COUNT 2**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
**WARRANTY AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**
**(On Behalf of the Louisiana Plaintiffs)**

343.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as

though fully set forth herein.

344.    Audi is and was at all relevant times a merchant with respect to motor vehicles.

345.    A warranty that the Fraudulent Vehicles were in merchantable condition is

implied by law in the instant transactions.

346.    The Fraudulent Vehicles were not in merchantable condition and were not fit for

ordinary vehicles are used because they share a common defect in that they are equipped with

defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

347.   As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MAINE COUNTS

### MAINE COUNT 1
### VIOLATIONS OF MAINE UNFAIR TRADE PRACTICES ACT
### (Me. Rev. Stat. Ann. Tit. 5 § 205a, et seq.)
### (On behalf of the Maine Plaintiffs)

348.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

349.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce·...." Me. Rev. Stat. Ann. Tit. 5 § 207.

350.   In the course of its business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

351.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

352.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

353.    Audi knew or should have known that its conduct violated the Maine UTPA CPA.

354.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.  possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.  intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.   made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

355.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

356.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

357.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have

purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

358.    As a direct and proximate result of Defendants' violations of the Maine UTPA,

359.    Plaintiffs have suffered injury-in-fact and/or actual damage.

360.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

361.    As a direct and proximate result of Defendants' violations of the Maine UTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

362.    Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiffs seek an order enjoining Audi's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

### MAINE COUNT 2
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Me. Rev. Stat. Tit. 11 §§ 2-314 and 2-1212)
### (On behalf of the Maine Plaintiffs)

363.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

364.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(I)(d).

365.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§ 2-1103(l)(p).

366.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning 14 of Me. Rev. Stat. Ann. Tit.. 11,§§ 2-105(1), and 2-l 103(1)(h).

367.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11,§§ 2-314,.and 2-1212.

368.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

369.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

### MAINE COUNT 3
### BREACH OF EXPRESS WARRANTY
### (Me. Rev. Stat. Tit.. 11 §§ 2-313 and .2-1210)
### (On behalf of the Maine Plaintiffs)

370.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

371.    The Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11,§§ 2-104( 1) and 2-1103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

372.    With respect to leases, the Defendants are and were at all relevant times "lessors" of motor vehicles under Me. Rev. ·Stat. Anh. Tit. 11,§ 2-1103(1)(p).·

373.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning 17 of Me. ·Rev. Stat. Ann. Tit. 11,§·§ 2105(1), and 2-1103(l)(h).

374.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

375.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

376.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## MARYLAND COUNTS

### MARYLAND COUNT 1
### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
(Md. Code Com. Law § 13-101, et seq.)
(On Behalf of the Maryland Plaintiffs)

377.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

378.    Audi and Plaintiffs are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

379.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer

good. Md. Code Com. Law § 13-303. Audi participated in misleading, false, or deceptive acts that violated the Maryland CPA.

380.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

381.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

382.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

383.    Audi knew or should have known that its conduct violated the Maryland CPA.

384.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

    a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

    b.    intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

385.    Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

386.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

387.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

388.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public.  Audi's unlawful acts and practices complained of herein affect the public interest.

389.    As a direct and proximate result of Audi's violations of the Maryland CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

390.    Pursuant to Md. Code Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**MARYLAND COUNT 2**
**MARYLAND LEMON LAW**
**(Md. Code. Com. Law § 14-1501, et seq.)**
**(On Behalf of the Maryland Plaintiffs)**

391.    Plaintiffs own or lease "motor vehicles" within the meaning of Md. Code, Com. Law § 14-1501(f), because these vehicles were registered in the state and fall within the categories of vehicles manufactured, assembled, or distributed by Audi. These vehicles are not auto homes.

392.    Audi is and was a "manufacturer]" of the Fraudulent Vehicles within the meaning of Md. Code, Com. Law § 14-1501(d).

393.    Plaintiffs are "consumers" within the meaning of Md. Code, Com. Law § 14-1501(b) because they: purchased the Fraudulent Vehicles, were transferred the Fraudulent Vehicles during the warranty period, or are otherwise entitled to the attendant terms of warranty.

394.    The Fraudulent Vehicles did not conform to their "warranties" under Md. Code, Com. Law § 14-1501(g) during the warranty period because they emitted grossly larger quantities of noxious $CO_2$ gasses than warranted and contained a "defeat device" designed to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use and market value of their motor vehicles.

395.    Audi had actual knowledge of the conformities during the "warranty period" within the meaning of Md. Code, Com. Law § 14-1501(e). But the nonconformities continued to exist throughout this term, as they have not been fixed. Plaintiffs are excused from notifying Audi of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

396.     Audi has had a reasonable opportunity to cure the nonconformities during the warranty period because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Md. Code, Com. Law § 14-1502.

397.     Plaintiffs demand a full refund of the purchase price, including all license fees, registration fees, and any similar governmental charges. Md. Code, Com. Law § 14- 1502(c). Once payment has been tendered, Plaintiffs will return their vehicles.

**MARYLAND COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Md. Code Com. Law §§ 2-314 and 2A-212)**
**(On Behalf of the Maryland Plaintiffs)**

398.     Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

399.     Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

400.     With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

401.     The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

402.     A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law

§§ 2-314, and 2a-212.

403.     A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

404.    The Fraudulent Vehicles were not in merchantable condition and were not fit for

ordinary vehicles are used because they share a common defect in that they are equipped with

defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel

efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing.

However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially

increased amount of noxious gasses.

405.    As a direct and proximate result of Audi's breach of the implied warranty of

merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**MARYLAND COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(Md. Code Com. Law §§ 2-313 and 2a-210)**
**(On Behalf of the Maryland Plaintiffs)**

406.    Plaintiffs re-allege and incorporate by reference all preceding allegations as

though fully set forth herein.

407.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles

under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

408.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor

vehicles under Md. Code Com. Law § 2A-103(1)(p).

409.    The Fraudulent Vehicles are and were at all relevant times "goods" within the

meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

410.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in

that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit

emissions and increase fuel efficiency when the vehicles are being subject to regulatory

emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use

on the road, they emit a substantially increased amount of noxious gasses.  The installation of the

defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

411.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

412.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## MASSACHUSETTS COUNTS

### MASSACHUSETTS COUNT 1
### DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (Mass. Gen. Laws Ch. 93a, § 1, et seq.)
### (On Behalf of the Massachusetts Plaintiffs)

413.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

414.    Audi and Plaintiffs are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

415.    Audi engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

416.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.  Audi participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

417.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles

would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

418.   Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

419.   Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

420.   Audi knew or should have known that its conduct violated the Massachusetts Act.

421.   Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

   a.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

   b.    intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

   c.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

422.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

423.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

424.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Audi's misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

425.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public.  Audi's unlawful acts and practices complained of herein affect the public interest.

426.    As a direct and proximate result of Audi's violations of the Massachusetts Act, Plaintiffs have suffered injury-in-fact and/or actual damage.

427.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs seek monetary relief against Audi measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Audi's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

428.    Plaintiffs also seek an order enjoining Audi's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

429.    Audi failed to remedy its unlawful conduct within the requisite time period. Therefore, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

430.    As a result of Audi's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### MASSACHUSETTS COUNT 2
### MASSACHUSETTS LEMON LAW
### (Mass. Gen. Laws Ch. 90, § 7N1/2(1))
### (On Behalf of the Massachusetts Plaintiffs)

431.    Plaintiffs own or lease "motor vehicles" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1), because these vehicles were constructed or designed for propulsion by power and were sold, leased, or replaced by Audi. These vehicles are not: (1) auto homes, (2) vehicles built primarily for off-read use, and (3) used primarily for business purposes.

432.    Audi is a "manufacturer" of the Fraudulent Vehicles within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1).

433.    Plaintiffs are "consumers" within the meaning of Mass. Gen. Laws Ch. 90, § 7N1/2(1) because they bought or leased the Fraudulent Vehicles or are otherwise entitled to the attendant terms of warranty.

434.    The Fraudulent Vehicles did not conform to their express and implied warranties because they were not cleaner vehicles and contained a "defeat device" designed to circumvent state and federal emissions standards. These devices did in fact circumvent emissions standards and substantially impaired the use, market value, and safety of their motor vehicles.

435.    Audi had actual knowledge of the nonconformities during the "term of protection" within the meaning of Mass. Gen. Laws Ch. 90, §§ 7N1/2(1)–7N1/2(2). But the non-conformities continued to exist throughout this term, as they have not been fixed. Plaintiffs are excused from notifying Audi of the nonconformities because it was already fully aware of the problem—as it intentionally created it—and any repair attempt is futile.

436.   Audi has had a reasonable opportunity to cure the nonconformities because of its actual knowledge of, creation of, and attempt to conceal the nonconformities, but has not done so as required under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

437.   For vehicles purchased, Plaintiffs demand a full refund of the contract price. For vehicles leased, Plaintiffs demand a full refund of all payments made under the lease agreement. Plaintiff exercise their "unqualified right" to reject an offer of replacement and will retain their vehicles until payment is tendered under Mass. Gen. Laws Ch. 90, § 7N1/2(3).

## MASSACHUSETTS COUNT 3
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mass. Gen. Laws c. 106 §§ 2-314 and 2A-212)
### (On Behalf of the Massachusetts Plaintiffs)

438.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

439.   Audi is and was at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

440.   With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under M.G.L. c. 106 § 2A-103(1)(p).

441.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

442.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212.

443.   The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel

-75-

efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

444.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**MASSACHUSETTS COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(Mass. Gen. Laws c. 106 §§ 2-313 and 2A-210)**
**(On Behalf of the Massachusetts Plaintiffs)**

445.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

446.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

447.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

448.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

449.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices." These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses. The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

450.     As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

451.     As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## MICHIGAN COUNTS

### MICHIGAN COUNT 1
### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, et seq.)
### (On Behalf of the Michigan Plaintiffs)

452.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

453.     Plaintiffs are were at all relevant times "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

454.     At all relevant times, Audi is and was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

455.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  Mich. Comp. Laws § 445.903(1). Audi engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb)

Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

456.    In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

457.    Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

458.    Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

459.    Audi knew or should have known that its conduct violated the Michigan CPA.

460.    Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.   intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.    made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

461.   Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

462.    Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

463.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

464.   Audi's violations present a continuing risk to Plaintiffs as well as to the general public.  Audi's unlawful acts and practices complained of herein affect the public interest.

465.   As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

466.   Plaintiffs seek injunctive relief to enjoin Audi from continuing its unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for

Plaintiffs; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

467.    Plaintiffs also seek punitive damages against Audi because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  Audi intentionally and willfully misrepresented the safety and reliability of the Fraudulent Vehicles, concealed material facts that only they knew, and repeatedly promised Plaintiffs that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Fraudulent Vehicles. Audi's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## MICHIGAN COUNT 2
## BREACH OF EXPRESS WARRANTY
### (Mich. Comp. Laws §§ 440.2313 and 440.2860)
### (On Behalf of the Michigan Plaintiffs)

468.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

469.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

470.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

471.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

472.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory

emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses. The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

473.   As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs. Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

474.   As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

**MICHIGAN COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mich. Comp. Laws §§ 440.2314 and 440.2860)**
**(On Behalf of the Michigan Plaintiffs)**

475.   Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

476.   Audi is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(d).

477.   With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

478.   The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

479.   A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to MICH. COMP. LAWS §§ 440.2314 and 440.2862.

480.     The Fraudulent Vehicles were not in merchantable condition and were not fit for

ordinary vehicles are used because they share a common defect in that they are equipped with

defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel

efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing.

However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially

increased amount of noxious gasses.

481.     As a direct and proximate result of Audi's breach of the implied warranty of

merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

## MINNESOTA COUNTS

### MINNESOTA COUNT 1
### VIOLATIONS OF MINNESOTA PREVENTION
### OF CONSUMER FRAUD ACT
### (Minn. Stat. § 325f.68, et seq.)
### (On Behalf of the Minnesota Plaintiffs)

482.     Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

483.     The Fraudulent Vehicles constitute "merchandise" within the meaning of Minn.

Stat. § 325F.68(2).

484.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1).  Audi participated in

misleading, false, or deceptive acts that violated the Minnesota CFA.

485.     In the course of their business, Audi concealed and suppressed material facts concerning the Fraudulent Vehicles.  Defendants accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing.  During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.

486.     Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

487.     Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

488.     Audi knew or should have known that its conduct violated the Minnesota CFA.

489.     Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.      possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.      intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.       made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in

particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

490.     Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

491.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

492.     Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

493.     Audi's violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

494.     As a direct and proximate result of Audi's violations of the Minnesota CFA, Plaintiffs have suffered injury-in-fact and/or actual damage.

495.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

496.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Audi's acts show deliberate disregard for the rights or safety of others.

**MINNESOTA COUNT 2**
**VIOLATIONS OF MINNESOTA UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325d.43-48, et seq.)**
**(On Behalf of the Minnesota Plaintiffs)**

497.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

498.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

499.    In the course of Audi's business, it engaged in deceptive practices by representing that the Fraudulent Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; representing that Fraudulent Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising the Fraudulent Vehicles with intent not to sell them as advertised. Audi accomplished this by installing illegal defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low emission test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious $CO_2$ gasses.  The result was what Audi intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Audi's representations were false and misleading because Audi's defeat device

software was extremely sophisticated technology. Plaintiffs did not and could not unravel Audi's deception on their own.  Thus, Audi engaged in deceptive business practices prohibited by the Minnesota DTPA.

500.     Audi's actions as set forth above occurred in the conduct of trade or commerce.

501.     Audi thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Fraudulent Vehicles.

502.     Audi intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

503.     Audi knew or should have known that its conduct violated the Minnesota DTPA.

504.     Audi owed Plaintiffs a duty to disclose illegality, public health and safety risks, the true nature of the Fraudulent Vehicles and the devaluing of safety at Audi, because Audi:

a.     possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with regulations;

b.     intentionally concealed the foregoing from regulators and Plaintiffs,; and/or

c.     made incomplete representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

505.     Audi's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Fraudulent Vehicles' fuel consumption of $CO_2$ emissions were material to Plaintiffs.

506.     Audi's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs.

507.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who purchased or leased the Fraudulent Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use

508.    Audi's violations present a continuing risk to Plaintiffs as well as to the general public. Audi's unlawful acts and practices complained of herein affect the public interest.

509.    As a direct and proximate result of Audi's violations of the Minnesota DTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

510.    Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

511.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that Audi's acts show deliberate disregard for the rights or safety of others.

**MINNESOTA COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Minn. Stat. §§ 336.2-314 and 336.2A-212)**
**(On Behalf of the Minnesota Plaintiffs)**

512.    Plaintiffs re-allege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

513.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

514.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

515.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

516.    A warranty that the Fraudulent Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

517.    The Fraudulent Vehicles were not in merchantable condition and were not fit for ordinary vehicles are used because they share a common defect in that they are equipped with defeat devices.  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.

518.    As a direct and proximate result of Audi's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**MINNESOTA COUNT 4**
**BREACH OF EXPRESS WARRANTY**
**(Minn. Stat. §§ 336.2-313 and 336.2A-210)**
**(On Behalf of the Minnesota Plaintiffs)**

519.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

520.    Audi is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

521.    With respect to leases, Audi is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

522.    The Fraudulent Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

523.    As set forth above in detail, the Fraudulent Vehicles are inherently defective in that they are equipped with "defeat devices."  These defeat devices are designed to secretly limit emissions and increase fuel efficiency when the vehicles are being subject to regulatory emissions and fuel efficiency testing. However, when the Fraudulent Vehicles are in regular use on the road, they emit a substantially increased amount of noxious gasses.  The installation of the defeat device substantially impairs the use and value of the Fraudulent Vehicles to reasonable consumers.

524.    As a result of Audi's breach of their express warranties, Plaintiffs received goods whose defect substantially impairs their value to Plaintiffs.  Plaintiffs have been damaged as a result of, inter alia, the diminished value of Audi's products.

525.    As a direct and proximate result of Audi's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request this Court:

A.    Award damages, including compensatory and exemplary damages, to Plaintiffs;

B.    Award Plaintiffs actual damages sustained;

C.    Award Plaintiffs such additional damages, over and above the amount of their actual damages, that are authorized and warranted by law, applicable;

D.    Grant restitution to Plaintiffs and require Defendants to disgorge inequitable gains;

E.       Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Fraudulent Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs with appropriate curative notice regarding the existence and cause of the defect;

F.       Award Plaintiffs punitive damages;

G.       Award Plaintiffs their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

H.       Award such other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  April 27, 2017

HEYGOOD, ORR & PEARSON

By: /s/ Michael E. Heygood
MICHAEL E. HEYGOOD,
PSC Member/MDL No. 2672-CRB
Texas Bar No. 00784267
CHARLES MILLER,
ESQ./SBN: 276523
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

Admission *Pro Hac Vice*
to be Sought for:

ERIC D. PEARSON,
Texas Bar No. 15690472
**HEYGOOD, ORR & PEARSON**
6363 North State Highway 161
Suite 450
Irving, Texas 75038
Telephone: (214) 237-9001
Facsimile: (214) 237-9002

**Attorney for Plaintiffs**